UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

ELECTRONIC ENVIRONMENTS CORPORATION,)
        Plaintiff                )
                           )
v.                           )       **Civil Action No. 05-11093 NG**
                           )
JAMES M. EMMING,          )
        Defendant          )
                           )

---

## <u>AFFIDAVIT OF KENNETH A. RAPOPORT</u>

I, Kenneth A. Rapoport, depose and say as follows:

1.      I am the founder of Electronic Environments Corporation ("EEC"), which has been conducting its business since 1986.  From 1988 through 2000, I was president of EEC.  From 2001 through the present, I have been CEO of EEC.  I have personal knowledge of the facts contained in this Affidavit except where, as indicated, I was informed of certain facts by EEC employees reporting to me in my capacity as CEO.[1]

2.      EEC is a Massachusetts corporation with its principal place of business located at 410 Forest Street, Marlborough, Massachusetts 01752.  EEC is engaged, *inter alia*, in the business of providing maintenance services and other technical services for DC telecommunications power systems and AC uninterruptible systems ("UPS") throughout the United States.  More specifically, EEC conducts its business in some 21 states which include: Alabama, Arizona, California, Colorado, Connecticut, Kentucky, Louisiana, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Tennessee, Rhode Island, Texas, Vermont and

---

[1]See paragraphs 14 and 15.

Virginia.

3.      The services provided by EEC are provided by only a handful of companies in a small and highly competitive market.  Among EEC's largest and most aggressive competitors in that market is a Wisconsin company called J.T. Packard Associates, Inc. ("Packard").

4.      Defendant James M. Emming ("Emming") is a resident of 91 Leffingwell Road, Apt. D1, Uncasville, Connecticut6 06382.  After making application for employment with EEC, on June 7, 1999, EEC hired Emming as a field service/battery technician.  Prior to hiring Emming, EEC notified Emming that, among other things, he would be an employee at will and that he would have to sign a non-competition and confidentially agreement as a condition of his employment.  A true copy of that May 11, 1999 notice is attached hereto as Exhibit "A".

5.      On the date of his hire, June 7, 1999, Emming did execute a Non-Competition And Confidentiality Agreement ("non-compete/confidentiality agreement") with EEC.  A true copy of the non-compete/confidentiality agreement is attached hereto as Exhibit "B".

6.      Paragraph 1. of the non-compete/confidentiality agreement reads as follows:

> "**Non-Competition/Non-Solicitation:** During the period of my employment  by the Company, I shall devote my full time and best efforts to the business of the Company.  Further, during the period of my employment by the Company and for one year thereafter regardless of the circumstances surrounding my termination, I shall not, directly or indirectly, alone or as a consultant, partner, officer, director, employee or stockholder of any entity, (a) engage in any business activity which is in competition with the

products or services being developed, manufactured, marketed, or sold by the Company, (b) solicit, do business or attempt to do business with any other customer or prospective customer of the Company with whom I have solicited or had contact with while employed by the Company, or (c) employ, or knowingly permit any entity which is directly or indirectly controlled by me to employ, any person who is employed by the Company, or is an agent or consultant of the Company, at any time during my employment or during the period of one year thereafter, or in any manner seek to solicit, recruit or induce any such person to leave employment with the Company, or assist in the recruitment or hiring of any such person. (emphasis supplied)

Paragraph 2 (a) of the non-compete/confidentiality agreement reads:

"**Confidentiality:**
(a)  I shall not at any time, whether during or after the termination of my employment, reveal to any person or entity any of the trade secrets or confidential information concerning the organization, business, operations, intellectual property or finances of the Company, or of any third party which the Company is under obligation to keep confidential, including, but not limited to, trade secrets or confidential information respecting inventions, products, evaluations, designs, methods, knowhow, techniques, systems, processes, software programs, software code, works of authorship, customer lists, sales projections, sales pipeline reports, customer profiles and/or purchasing history, marketing plans or other business plans, personnel information, projects, and proposals (collectively "Confidential Information"), except to employees of the Company who need to know such Confidential Information for the purposes of their employment, or as otherwise authorized by the Company in writing. I shall keep secret all matters entrusted to me and shall not use or attempt to use Confidential Information in any manner which may injure or cause loss to the Company, whether directly or indirectly."

Paragraphs 3. and 9. of the non-compete/confidentiality agreement read, respectively, as follows:

"3.    **Remedies:**  I agree that any breach of this Agreement by me will cause irreparable damage to the Company and the Company shall have, in addition to any and all remedies of law, the right to an injunction, specific

performance or to other equitable relief.  In the event that the Company prevails in any litigation to enforce any of its rights under this Agreement, I agree to pay all costs and expenses of the Company, including reasonable attorney's fees, incurred in enforcing this Agreement." (emphasis supplied)

> "9.    **Choice of law:**  This Agreement shall be governed by the <u>laws of the Commonwealth of Massachusetts</u> without giving effect to the principles of conflicts of laws herein.  Any claims by one party against the other shall be maintained in any court located in Massachusetts, and I hereby submit to the jurisdiction and venue of any such court." (emphasis supplied)

7.    Field Technicians like Emming were, and are, required by EEC to execute EEC' s non-compete/confidentiality agreement to protect EEC's confidential information and to protect EEC's unique relationships with its clients, essentially as described below.

**Confidential Information**

8.    Field Service Technicians have access to a wide range of confidential information, the disclosure of which can severely hurt EEC's business.  As a company, we routinely make documents "company confidential"; we explain in detail to employees like Emming their responsibilities to the company in EEC's Employee Manual; we require signature of a confidentiality document at hire; and, we have attempted to shield unnecessary information from these employees.  Nonetheless, due to their mission critical job responsibilities, as well as important role as primary "account liaison," it is still important for Field Technicians like Emming to have access to much of EEC's confidential information. None of this information would be available through any other means other than their employment and job responsibilities at EEC.  The following information known by our Field Technicians about our EEC contracts would be a powerful tool in our competitors' hands:

      a.    client names, addressed and phone numbers
      b.    equipment type, manufacturer, ages, condition, and service level required

    c.      actual contract amounts, start and end dates, term of contract - offers competitors broad efficiency to target clients and obvious advantageous to bidding work

    d.      decision makers' and influencers' names, their direct phone numbers and even mobile/cell numbers

    e.      on-going opportunities (or even knowledge of future opportunities which may have been shielded from EEC) held for personal gain

    f.      EEC Training materials, equipment manuals, proprietary field service forms

    g.      Field Technicians, by the nature of their mission critical response needs, have complete access to company confidential list of employees, mobile phones and even home phone numbers[2].

## Unique Relationships

_____9._____Emming was employed as an Electronic Field Technician for EEC approximately June 7, 1999 to March 28, 2005. Emming provided electronic field services to EEC clients, visiting their sites only twice per year, and sometimes providing the only EEC client contact for many years. Field Technicians' job responsibilities included account management. EEC Field Technicians are actively evaluated on client relations during annual performance reviews, which provides additional incentive for them to cultivate client relationships.

10.     EEC Field Technicians respond "24x7," and often arrive at extremely tense and emotional situations for EEC clients' problems. The Field Technician typically receives the most of the credit for being "on-the site," and accepts the accolades by the client. Field Technicians often work to promote their own individual relationships with clients in order to reap the maximum in annual raises, and to increase their own job

---

[2]Recently, we have seen unprecedented recruitment efforts of EEC's employees by Packard through contact via cell phones by Packard, Emming's new employer. Mobile phone numbers are not available through any source other than EEC's confidential employee list.

security.  Field Technicians' personal relationships with clients often supercede company's initial relationship with the clients.

11.    EEC Field Technicians use their unique relationship with clients to secure a wide range of sales opportunities beyond service, including engineering and construction.[3]  With their unique relationship, clients may view the technician as an "impartial field employee," rather than an influential account manager whose job responsibilities and financial incentives encourage the securing of new business.  Field Service Technicians, in short, tend to develop stronger personal bonds with EEC clients which most often supercede EEC's relationship with the client.

12.    Emming as a Field Service Technician proved to be a particularly valuable asset with respect to client relations.  Excerpts from his personnel file in that regard are as follows:

10/27/99 Memo J. Harmon - Emming - Accompanied $1000 Bonus: Thanks Emming for meeting Navisites' "unique and unusual requirement of full time on site personnel."  States that "the time that [he] spent at the Navisite data center gave the customer a high degree of confidence in their system reliability and the knowledge that they would receive instantaneous response to any emergency." A true copy of the relevant portions of the evaluation are attached hereto as Exhibit "C."

Annual Performance Review (1999-2000) by J. Peltier - Customer Service: "He is courteous and displays sensitivity to customer needs.  He is able to handle some difficult or emotional customer situations...Jim needs to utilize customer feed back to improve

---

[3]EEC also provides both engineering and construction services.

service...Jim typically keeps customers informed." Reviewer Comments: "As Connecticut grows as a customer base, Jim will be a valued entity in this area." A true copy of the relevant portions of the evaluation are attached hereto as <u>Exhibit "D</u>."

Field Technician Annual Performance Review (2002-2003) by P. Iodice - Interpersonal Skills: "Jim has done a good job of building professional relationships with people both inside and outside the company. His willingness to be cooperative and helpful makes him an easy person to work with." A true copy of the relevant portions of the evaluation are attached hereto as <u>Exhibit "E</u>."

Field Technician Annual Performance Review (2003-2004) by P. Iodice - Interpersonal Skills: "Jim has done a good job of building professional relationships with people both inside and outside the company. His willingness to be cooperative and helpful makes him an easy person to work with. I have received very positive feedback from customers." A true copy of the relevant portions of the evaluation are attached hereto as <u>Exhibit "F.</u>"

13.     Prior to Emming terminating his employment with EEC, Packard had engaged EEC in negotiations for a possible business relationship. In conjunction with those negotiations, Packard and EEC entered into a Mutual Confidentiality Agreement on May 15, 2004 for a period of one year, so that EEC and Packard could safely exchange confidential information in furtherance of the negotiations.

14.     I am informed by the EEC employees involved, that on March 15, 2005 at a meeting with its client Level 3 Communications, employees of Level 3 Communications raised questions about a possible EEC/Packard business partnership. Up to that point EEC had taken precautions to keep that information confidential and limited to officers of

-7-

EEC.

15.     I am informed by the EEC employees involved, that on March 21, 2005 Packard attempted to recruit EEC's Mid-Atlantic Regional Manager, Eugene McNeil, by offering him employment as Packard's "Business Development Manager."

16.     As late as March 23, 2005, Emming performed service for EEC as an employee of EEC at Cingular's telecommunications site in Bolton, Massachusetts.

17.     On March 28, 2005 Emming informed EEC that he was leaving EEC's employment.  From the date of his hire up to that time, Emming remained a Field Service Technician.  His salary at the time of his resignation was $71,942.00.

18.     On March 30, 2005, EEC was informed by an employee of its client, Cingular, that Emming was working for Packard, and that Packard was actively seeking to become an authorized Cingular technical service and maintenance vendor, in direct competition with EEC.

19.     EEC was later informed and believes that Emming was hired by Packard at a salary of $75,000.00 per year, with a $5,000.00 signing bonus and a 3% incentive fee for all EEC service contracts Emming is able to acquire for Packard in competition with EEC.[4]

20.     To protect ECC's business interests, EEC filed this suit against Emming on April 26, 2005.  Emming was served with the suit on May 6, 2005.

---

[4]Emming admits this in his answer except for the 3% incentive fee.

-8-

Signed by me on this ___ day of October 2005 under the pains and penalties of perjury.

_____/s/ Kenneth A. Rapoport_____
Kenneth A. Rapoport, CEO
Electronic Environments Corporation


COMMONWEALTH OF MASSACHUSETTS

Suffolk County, MA                                  OCTOBER 25, 2005

Signed before me on this 25th day of October 2005 under the pains and penalties of perjury.

____/s/ Leo S. McNamara_____
Notary Public
My commission expires:

**Electronic
Environments**
Infrastructure Solutions

Northeast Region
Mid-Atlantic Region

Corporate Headquarters
60 Shawmut Road
Canton, MA 02021-1410
USA

Tel 800-342-5332
Fax 781-828-9554

www.eecnet.com

May 11, 1999

James M. Emming
91 Leffingwell Road Aprt D1
Uncassville, CT 06382

Dear James:

We are pleased to offer you the full-time position of Battery Technician with Electronic Environments
Corporation ("the Company"). The purpose of this letter is to describe the general terms and conditions of
your employment with the Company.

Let me take this opportunity to welcome you to the EEC team.

Position Responsibilities:
Your job responsibilities will include the normal and customary duties involved in providing field services
in the Site Services Division within EEC. The specifics of your responsibilities shall be communicated to
you by the manager of Electronic Services, Jim Peltier.

Compensation
Your starting hourly rate shall be $15.50 per hour. You shall be paid at the rate of time and one half for
Saturdays and Sundays as well as for all hours worked over 40 per week. In addition, you shall be paid
double-time for working on Company-named Holidays (10/year). Should you remain in the Company's
employ, your rate will be reviewed annually on the anniversary of your starting date.

Expenses:
The Company will reimburse you for all actual, necessary and reasonable expenses, subject to corporate
expense policy.

Fringe Benefits:
You will be entitled to receive the fringe benefits available to the Company's associates. The Company's
associate benefits package currently includes the following:

> 1. Health Insurance:    Harvard/Pilgrim Health Plan
>                         AETNA HealthCare
> (Approximately 60% employer paid for Family coverage and 75% for Individual coverage)
> 2. Dental Insurance – Delta Dental of Massachusetts (50% employer paid)
> 3. Group long-term disability coverage (100% employer paid)
> 4. Two weeks paid vacation; 3 weeks after 5 years
> 5. Ten paid holidays
> 6. 401(k) matching contributions ($.50/$1.00 on first 4% contributed for 1999)
> 7. Five sick days and one personal day
> 8. Full tuition reimbursement for job-related training

The Company's fringe benefits and the terms and conditions associated with them are more fully described in the Company's Policy Manual and/or other plan documents. In the event of a conflict with this letter, the terms of the policy manual or other plan documents shall govern. The Company may, of course, amend or enhance the benefits provided to you and our other associates from time to time as it deems appropriate.

Internal Policies:
During your employment with the Company, you will be required to follow all of the Company's internal policies and to conduct your business activities at all times in accordance with the highest legal, ethical, and professional standards.

Employment At Will:
Your employment with the Company shall be at will. In the event that either you or the Company elects to terminate your employment relationship, the party seeking to terminate shall provide the other with 2 weeks advance notice.

You shall be required to sign a non-competition and confidentiality agreement as a condition of your employment.

Proprietary Information:
During your employment at the Company, you may gain access to certain non-public information relating to the Company's business. Such information is, and shall remain proprietary to, and the property of, the Company. You agree to keep such information in confidence, except as necessary to serve the Company's legitimate purposes, and you further agree that upon your termination from the Company, you will return to the Company all customer lists, documentation, correspondence, and all other data of the Company then in your possession and all copies thereof.

Very Truly Yours,


Andrew Dimitri
President
Site Services Division

Accepted By:_____
Print Name:_____
Date:_____


cc:    Personnel

Case 1:05-cv-10983-NG CONFIDENTIAL Filed 10/28/2005 Page 1 of 5

In consideration and as a condition of my employment or continued employment by Electronic Environments Corporation or any of its subsidiaries, divisions or affiliates (collectively the "Company"), I hereby agree with the Company as follows:

1. **Non-Competition/Non-Solicitation:** During the period of my employment by the Company, I shall devote my full time and best efforts to the business of the Company. Further, during the period of my employment by the Company and for one year thereafter regardless of the circumstances surrounding my termination, I shall not, directly or indirectly, alone or as a consultant, partner, officer, director, employee or stockholder of any entity, (a) engage in any business activity which is in competition with the products or services being developed, manufactured, marketed, or sold by the Company, (b) solicit, do business or attempt to do business with any customer or prospective customer of the Company with whom I have solicited or had contact with while employed by the Company, or (c) employ, or knowingly permit any entity which is directly or indirectly controlled by me to employ, any person who is employed by the Company, or is an agent or consultant of the Company, at any time during my employment or during the period of one year thereafter, or in any manner seek to solicit, recruit or induce any such person to leave employment with the Company, or assist in the recruitment or hiring of any such person.

2. **Confidentiality:**
   (a) I shall not at any time, whether during or after the termination of my employment, reveal to any person or entity any of the trade secrets or confidential information concerning the organization, business, operations, intellectual property or finances of the Company, or of any third party which the Company is under obligation to keep confidential, including, but not limited to, trade secrets or confidential information respecting inventions, products, evaluations, designs, methods, know-how, techniques, systems, processes, software programs, software code, works of authorship, customer lists, sales projections, sales pipeline reports, customer profiles and/or purchasing history, marketing plans or other business plans, personnel information, projects, and proposals (collectively "Confidential Information"), except to employees of the Company who need to know such Confidential Information for the purposes of their employment, or as otherwise authorized by the Company in writing. I shall keep secret all matters entrusted to me and shall not use or attempt to use Confidential Information in any manner which may injure or cause loss to the Company, whether directly or indirectly.
   (b) Furthermore, I agree that during my employment I shall not make, use or permit to be used any notes, memoranda, reports, lists, records, drawings, sketches, specifications, software programs, data, documentation or other materials of any nature, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs (collectively "Company Documentation") otherwise than for the benefit of the Company. I further agree that I shall not, after the termination of my employment, use or permit to be used any Company Documentation, it being agreed that all Company Documentation shall be and remain the sole and exclusive property of the Company. Immediately upon the termination of my employment I shall deliver all Company Documentation in my possession, and all copies thereof, to the Company, at its main office.

3. **Remedies:** I agree that any breach of this Agreement by me will cause irreparable damage to the Company and the Company shall have, in addition to any and all remedies of law, the right to an injunction, specific performance or other equitable relief. In the event that the Company prevails in any litigation to enforce any of its rights under this Agreement, I agree to pay all costs and expenses of the Company, including reasonable attorney's fees, incurred in enforcing this Agreement.

4. **At-Will Employment:** I acknowledge that my employment is at-will, and that both I and the Company can terminate my employment without reason at any time. This Agreement does not create an obligation on the Company to continue my employment. I also agree that my obligations under this Agreement shall survive the termination of my employment regardless of the manner of such termination and shall be binding upon my heirs, executors, administrators and legal representatives. I agree that any change in my duties or compensation shall not affect the validity of this Agreement.

5. **Amendments:** Any amendments to or modification of this Agreement, or any waiver of any provision hereof must be in writing and signed by the Company. Any waiver by the Company of a breach of any provision of this Agreement shall not be construed as a waiver of any subsequent breach of such provision or any other provision hereof.

6. **Enforceability:** I agree that each provision herein shall be treated as a separate and independent clause, and the unenforceability of any one clause shall not impair the enforceability of any of the other clauses of the Agreement. Moreover, if a provision contained in this Agreement shall be held to be excessively broad in scope, so as to be unenforceable at law, such provision shall be construed by the appropriate judicial body by limiting it so as to be enforceable to the maximum extent compatible with the applicable law as it shall then appear. I hereby further agree that the language of all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning and not strictly for or against either of the parties.

7. This Agreement represents the complete and sole understanding between the parties, and supersedes any other agreement or understanding, whether oral or written, concerning non-competition and confidentiality. This Agreement is deemed to govern from its inception going forward.

8. **Assignment:** The Company shall have the right to assign this Agreement to its successors and assigns, and all agreements hereunder shall inure to the benefit of said successors or assigns. I agree that I will not assign this Agreement.

9. **Choice of law:** This Agreement shall be governed by the laws of the Commonwealth of Massachusetts without giving effect to the principles of conflicts of laws therein. Any claims by one party against the other shall be maintained in any court located in Massachusetts, and I hereby submit to the jurisdiction and venue of any such court.

IN WITNESS HEREOF, the undersigned has executed this Agreement as a sealed instrument as of the date first above written.

6/2/99
Date

_Signature_

James Emming
Name – Please Print

I have received the Personnel Guidelines dated April 13, 1995.

**Name (print)** _____James Emming_____

**Signature:** _____

**Dated:** _____6/7/99_____

Please sign this form and return to the Construction Safety Officer:

I have received, read, and understand the Electronic Environments Corporation Construction Safety booklet.

James Emming
**Employee's Name - Typed or Printed**

**Employee's Signature**

6/7/99
**Date of Signature**

a:\safety\constsb.txt



**Environments**
*Infrastructure Solutions*

Northeast Region
Mid-Atlantic Region

Corporate Headquarters
60 Shawmut Road
Canton, MA 02021-1410
USA

Tel 800-342-5332
Fax 781-828-9554

www.eecnet.com

## ACKNOWLEDGEMENT

My signature at the bottom of this document signifies my understanding of and agreement to the statements below:

1.    I have received a complete listing of EEC clients, including equipment listing, contacts, phone numbers, directions and account numbers.

2.    I acknowledge that this information is the property of Electronic Environments Corporation and as such it is proprietary and confidential.

3.    I will use this information only for the purpose of doing my job.  I will not disclose this information to any person who is not an EEC employee.  I will not use this information for personal gain.

4.    Upon termination of employment, either voluntary or involuntary, I will return all EEC proprietary and confidential information to my supervisor.

5.    Under penalty of prosecution in accordance with State Law, my signature below signifies my agreement.

_____ 7/16/99          _____ 7/16/99
Employee/Date                              Supervisor/Date

Book #22

**Electronic Environments**
*Infrastructure Solutions*

## *Interoffice Memorandum*

TO:        J. Emming
FROM:      J. Harmon
DATE:      October 27, 1999
SUBJECT:   Navisite

I want to thank you for your effort in helping EEC to meet Navisites' unique and unusual requirement of full time on-site personnel. As you know, Navisite experienced several major power problems at a critical time in their business development. As a result of those problems they felt that their risk exposure was very high and would have a negative impact on business development.

The time that you spent at the Navisite data center gave the customer a high degree of confidence in their system reliability and the knowledge that they would receive instantaneous response to any emergency. Your presence was a benefit to EEC and to Navisite. I am pleased to provide a $1,000 bonus. The enclosed check is a token of appreciation for your contribution to the success of the Navisite project. Thank you and keep up the great work.

Cc: AD, JP

# Electronic Environments Corporation
## Performance Review

| | |
|---|---|
| **Review Form Name:** | Annual Performance Review |
| **Employee Name:** | James Emming |
| **Job Title:** | Service Technician |
| **Department:** | Site Services-Department 200 |
| **Date of Hire:** | 06/07/1999 |
| **Last Review Date:** | N/A |
| **Review Period Start:** | 06/13/1999 |
| **Review Period End:** | 06/13/2000 |
| **Reviewer Name:** | James Peltier |
| **Reviewer Title:** | Power Electronics Services Manager |
| **This Review Date:** | **August 2, 2000** |

# PERFORMANCE ELEMENTS

**Attendance & Punctuality**                          *Rating: 3*

Jim usually works out time off arrangements in advance and his attendance record is very good. When out of the office, he confirms that his responsibilities and commitments are managed. Coming from Connecticut, Jim will inform management of his late arrival, if applicable.

**Oral Communications**                          *Rating: 3*

Jim will actively work to make meetings successful. He presents information and ideas clearly and persuasively. To better understand others, he listens well, displaying interest and asking questions. Jim will respond well to questions and expresses interest in furthering his development.

**Written Communications**                          *Rating: 3*

His written materials are generally clear and informative. There are rarely spelling or grammatical mistakes in his writing. With progression, Jim will need to vary his writing style to meet different situations, administrative and technical.

**Cooperation**                          *Rating: 4*

Jim often extends himself more than required to assist and support his co-workers. He demonstrates and promotes cooperation when working in group situations. He usually establishes and maintains good working relationships while exhibiting tact and consideration in his relations with others. Jim maintains a good positive outlook, as this will be helpful in forming a solid department while establishing a reinforcing presence for existing and new employees.

**Customer Service**                          *Rating: 3*

Jim responds with a strong sense of urgency when supporting customers. He is courteous and displays sensitivity to customer needs. He is able to handle some difficult or emotional customer situations and fulfills commitments within expected timeframes. Jim needs to utilize customer feedback to improve service, individual and departmental. Jim typically keeps customers informed, when applicable, on updates pertaining to impending services and progressing repairs.

**Reviewer Comments:**

Overall, Jim meets or exceeds company expectations in all areas. As we make changes in the department and continue to grow in to new markets, we will require Jim to assist with these changes. As Connecticut grows as a customer base, Jim will be a valued entity in this area. Jim needs to focus on very few problem areas. As his training development progresses, his confidence will escalate. As with all the technicians, I will be looking for his assistance in organizing the office environment as a learning and productive place for all personnel to benefit. I personally am pleased with Jim's progress. As volunteered, he is actively participating in the "On Call" rotation. This is a gesture that has been appreciated by all the other technicians, as well as management.

_____

*Reviewer Signature/Date*

## Employee Acknowledgment

I have reviewed this document and discussed the contents with my manager. My signature means that I have been advised of my performance status and does not necessarily imply that I agree with the evaluation.

_____
                                              8/21/08
*Employee Signature/Date*

## Employee Comments:

# Field Technician Performance Review (Non-Exempt)

| | |
|---|---|
| **Employee Name:** | Jim Emming |
| **Job Title:** | PET 3 |
| **Department:** | 20-100 |
| **Supervisor/Manager:** | Paul Iodice |
| **Review Period:** | 9-7-2002 to 9-7-2003 |
| **Date:** | 9-8-03 |
| **Type of Review:** | [ X] Annual [ ] 6 month    [ ] Other |

## INTRODUCTION

**Rating Guide:**

| [1] | [2] | [3] | [4] | [5] |
|---|---|---|---|---|
| Unsatisfactory Performance | Improvement Desired | Meets Expectations | Exceeds Expectations | Outstanding Performance |

## REVIEW OF OBJECTIVES

*Record objectives from the previous review period in the space below and discuss the extent to which each objective was fulfilled. Also describe changes (if any) to original objectives.*

**Objective 1:**

**Objective 2:**

## Interpersonal Skills:

Effective in relating to other employees, peers, management and customers.  Is flexible/open-minded, solicits feedback and handles constructive criticism.

Rating: [ 3 ]

Comments:
Jim has done a good job of building professional relationships with people both inside and outside the company. His willingness to be cooperative and helpful makes him an easy person to work with.

## Job Knowledge:

Understands duties and responsibilities, has necessary job knowledge, has necessary technical skills,  keeps job knowledge current, Has practical and theoretical knowledge of equipment commensurate with training and time on the job

Rating: [ 4 ]

Comments:
Jim actively seeks to learn new skills and applies them quickly to his work. Also he has worked on many new units both in the UPS and DC plant  areas and has preformed quite well. And he is willing to share the knowledge with others.

## Productivity:

Manages a fair workload, volunteers for additional work, prioritizes tasks, develops good work procedures, manages time well, handles information flow.

Rating: [ 3 ]

Comments:

When the workload increases, Jim is ready to step up to the plate and help out.  He makes sure to handle his ongoing obligations as well as the new work.

## Sense of Urgency:

Prioritizes well, shows energy, reacts to opportunities, instills urgency in others, meets deadlines.  Meets or exceeds company and customer requirements.

Rating: [ 3 ]

Comments:
Jim deals with problems and opportunities as they arise, focusing the necessary energy and resources on the situation until it is resolved.  He also identifies new opportunities and takes action to follow up on them.

## Teamwork:

Meets all team deadlines and responsibilities, listens to others and values opinions, helps team leader to meet goals, welcomes newcomers and promotes a team atmosphere.

Rating: [ 4 ]

Comments:
Jim joins in the give and take of group discussions, and works well with everyone.  He is respected by co-

**Electronic Environments**
*Infrastructure Solutions*

# Field Technician Performance Review
# (Non-Exempt)

| | |
|---|---|
| **Employee Name:** | Jim Emming |
| **Job Title:** | PET 3 |
| **Department:** | 20-100 |
| **Supervisor/Manager:** | Paul Iodice |
| **Review Period:** | 9-7-2003 to 9-7-2004 |
| **Date:** | 10-8-03 |
| **Type of Review:** | [ X ] Annual [ ] 6 month    [ ] Other |

## INTRODUCTION

**Rating Guide:**

| [1] | [2] | [3] | [ ] |
|---|---|---|---|
| Unsatisfactory Performance | Improvement Desired | Meets Expectations | nding nance |

*OBJECTIVES DEVELOPMENT EXPECTATIONS*

## REVIEW OF OBJECTIVES

*Record objectives from the previous review period in the space below and discuss the extent to which each objective was fulfilled. Also describe changes (if any) to original objectives.*

**Objective 1:**

**Objective 2:**

Effective in relating to other employees, peers, management and customers. Is flexible/open-minded, solicits feedback and handles constructive criticism.

Comments:
Jim has done a good job of building professional relationships with people both inside and outside the company. His willingness to be cooperative and helpful makes him an easy person to work with. I have recived very positive feedback from customers.

## Job Knowledge:

Understands duties and responsibilities, has necessary job knowledge, has necessary technical skills, keeps job knowledge current, Has practical and theoretical knowledge of equipment commensurate with training and time on the job

Rating: [ 4 ]

Comments:
Jim actively seeks to learn new skills and applies them quickly to his work. Also he has worked on many new units both in the UPS and DC plant areas and has preformed quite well. And he is willing to share the knowledge with others by offering phone support to the other Tech's and customers.

## Productivity:

Manages a fair workload, volunteers for additional work, prioritizes tasks, develops good work procedures, manages time well, handles information flow.

Rating: [ 3 ]

Comments:

When the workload increases, Jim is ready to step up to the plate and help out. He makes sure to handle his ongoing obligations as well as the new work and covering oncall issues.

## Sense of Urgency:

Prioritizes well, shows energy, reacts to opportunities, instills urgency in others, meets deadlines. Meets or exceeds company and customer requirements.

Rating: [ 3 ]

Comments:
Jim deals with problems and opportunities as they arise, focusing the necessary energy and resources on the situation until it is resolved. He also identifies new opportunities and takes action to follow up on them.

## Teamwork:

Meets all team deadlines and responsibilities, listens to others and values opinions, helps team leader to meet goals, welcomes newcomers and promotes a team atmosphere.

Rating: [ 4 ]

Comments:
Jim joins in the give and take of group discussions, and works well with everyone.