UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ELECTRONIC ENVIRONMENTS CORPORATION, )
Plaintiff )
)
v. ) **Civil Action No. 05-11093 NG**
)
JAMES M. EMMING, )
Defendant )
)

**PLAINTIFF ELECTRONIC ENVIRONMENTS CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

Introduction

This is an action to enforce a covenant not to compete voluntarily entered into by the defendant as a condition of being hired and employed by the plaintiff.

Facts

EEC is a Massachusetts corporation with its principal place of business located at 410 Forest Street, Marlborough, Massachusetts 01752. EEC is engaged, *inter alia*, in the business of providing maintenance services and other technical services for DC telecommunications power systems and AC uninterruptible systems ("UPS") throughout the United States. More specifically, EEC conducts its business in some 21 states which include: Alabama, Arizona, California, Colorado, Connecticut, Kentucky, Louisiana, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Tennessee, Rhode Island, Texas, Vermont and Virginia. (Rapoport Aff. para. 2). The services provided by EEC are provided by only a handful of companies in a small and highly competitive market. Among EEC's largest and most aggressive competitors in that market is a Wisconsin company called J.T. Packard

Associates, Inc. ("Packard"). (Rapoport Aff. para. 3).

Defendant, James M. Emming ("Emming") is a resident of 91 Leffingwell Road, Apt. D1, Uncasville, Connecticut, 06382. After making application for employment with EEC, on June 7, 1999, EEC hired Emming as a field service/battery technician. Prior to hiring Emming, EEC notified Emming that, among other things, he would be an employee at will and that he would have to sign a non-competition and confidentially agreement as a condition of his employment.[1] (Rapoport Aff. para. 4). On the date of his hire, June 7, 1999, Emming did execute a Non-Competition And Confidentiality Agreement ("non-compete/confidentiality agreement") with EEC. (Rapoport Aff. para. 5). Paragraph 1. of the non-compete/confidentiality agreement reads, in part, as follows:

> "<u>**Non-Competition/Non-Solicitation**</u>**:** ... <u>Further, during the period of my employment by the Company and for one year thereafter regardless of the circumstances surrounding my termination, I shall not, directly or indirectly, alone or as a consultant, partner, officer, director, employee or stockholder of any entity, (a) engage in any business activity which is in competition with the products or services being developed, manufactured, marketed, or sold by the Company</u>, (b) solicit, do business or attempt to do business with any other customer or prospective customer of the Company with whom I have solicited or had contact with while employed by the Company..."(emphasis supplied)

Paragraph 2 (a) of the non-compete/confidentiality agreement reads:

> "<u>**Confidentiality**</u>**:** (a) I shall not at any time, whether during or after the termination of my employment, reveal to any person or entity any of the trade secrets or confidential information concerning the organization, business, operations, intellectual property or finances of the Company, or of any third party which the Company is under obligation to keep confidential, including, but not

[1]The May 11, 1999 letter to Emming from EEC offering him employment with EEC states on the second page under "Employment At Will," in a separate paragraph: "You shall be required to sign a non-competition and confidentiality agreement as a condition of your employment."

limited to, trade secrets or confidential information respecting inventions, products, evaluations, designs, methods, knowhow, techniques, systems, processes, software programs, software code, works of authorship, customer lists, sales projections, sales pipeline reports, customer profiles and/or purchasing history, marketing plans or other business plans, personnel information, projects, and proposals (collectively "Confidential Information"), except to employees of the Company who need to know such Confidential Information for the purposes of their employment, or as otherwise authorized by the Company in writing. I shall keep secret all matters entrusted to me and shall not use or attempt to use Confidential Information in any manner which may injure or cause loss to the Company, whether directly or indirectly."

Paragraphs 3. and 9. of the non-compete/confidentiality agreement read, respectively, as follows:

"**Remedies:** I agree that any breach of this Agreement by me will cause irreparable damage to the Company and the Company shall have, in addition to any and all remedies of law, the right to an injunction, specific performance or to other equitable relief. In the event that the Company prevails in any litigation to enforce any of its rights under this Agreement, I agree to pay all costs and expenses of the Company, including reasonable attorney's fees, incurred in enforcing this Agreement." (emphasis supplied)

**Choice of law:** This Agreement shall be governed by the laws of the Commonwealth of Massachusetts without giving effect to the principles of conflicts of laws herein. Any claims by one party against the other shall be maintained in any court located in Massachusetts, and I hereby submit to the jurisdiction and venue of any such court." (emphasis supplied) (Rapoport Aff. para. 6).

Field Technicians like Emming were, and are, required by EEC to execute EEC's non-compete/confidentiality agreement to protect EEC's confidential information and to protect EEC's unique relationships with its clients, essentially as described below. (Rapoport Aff. para. 7)

**Confidential Information**

______Field Service Technicians have access to a wide range of confidential information, the disclosure of which can severely hurt EEC's business. As a company, EEC routinely makes documents "company confidential"; EEC explains in detail to employees like Emming their responsibilities to the company in EEC's Employee Manual; EEC requires signature of a confidentiality document at hire; and, EEC has attempted to shield unnecessary information from these employees. Nonetheless, due to their mission critical job responsibilities, as well as important role as primary "account liaison," it is still important for Field Technicians like Emming to have access to much of EEC's confidential information. None of this information would be available through any other means other than their employment and job responsibilities at EEC. The following information known by our Field Technicians about EEC contracts would be a powerful tool in EEC's competitors' hands:

a. client names, addressed and phone numbers;
b. equipment type, manufacturer, ages, condition, and service level required;
c. actual contract amounts, start and end dates, term of contract - offers competitors broad efficiency to target clients and obvious advantageous to bidding work;
d. decision makers' and influencers' names, their direct phone numbers and even mobile/cell numbers;
e. on-going opportunities (or even knowledge of future opportunities which may have been shielded from EEC) held for personal gain;
f. EEC Training materials, equipment manuals, proprietary field service forms;
g. Field Technicians, by the nature of their mission critical response needs, have complete access to company confidential list of employees, mobile phones and even home phone numbers[2]. (Rapoport Aff. para. 8)

---

[2]Recently, EEC has seen unprecedented recruitment efforts of EEC's employees by Packard through contact *via* cell phones by Packard, Emming's new employer. Mobile phone numbers are not available through any source other than EEC's confidential employee list. (Rapoport Aff. para 8, fn. 2)

**Unique Relationships**

______Emming was employed as an Electronic Field Technician for EEC approximately from June 7, 1999 to March 28, 2005. Emming provided electronic field services to EEC clients, visiting their sites only twice per year, and sometimes providing the only EEC client contact for many years. Field Technicians' job responsibilities included account management. EEC Field Technicians are actively evaluated on client relations during annual performance reviews, which provides additional incentive for them to cultivate client relationships. (Rapoport Aff. para. 9) EEC Field Technicians respond "24x7," and often arrive at extremely tense and emotional situations for EEC clients' problems. The Field Technician typically receives the most of the credit for being "on-the site," and accepts the accolades by the client. Field Technicians often work to promote their own individual relationships with clients in order to reap the maximum in annual raises, and to increase their own job security. Field Technicians' personal relationships with clients often supercede company's initial relationship with the clients. (Rapoport Aff. para. 10). EEC Field Technicians use their unique relationship with clients to secure a wide range of sales opportunities beyond service, including engineering and construction.[3] With their unique relationship, clients may view the technician as an "impartial field employee," rather than an influential account manager whose job responsibilities and financial incentives encourage the securing of new business. Field Service Technicians, in short, tend to develop stronger personal bonds with EEC clients which most often supercede EEC's relationship with the client. (Rapoport Aff. para. 11)

Emming as a Field Service Technician proved to be a particularly valuable asset with respect to client relations. In a matter of months after being hired, Emming received accolades, and a bonus, for engendering a high degree of confidence in an EEC customer,

---

[3]EEC also provides both engineering and construction services.

Navisite. In his annual performance reviews from 1999 through 2004, Emming was consistently given high marks for customer relations.[4] (Rapoport Aff. para. 12).

Prior to Emming terminating his employment with EEC, Packard had engaged EEC in negotiations for a possible business relationship. In conjunction with those negotiations, Packard and EEC entered into a Mutual Confidentiality Agreement on May 15, 2004 for a period of one year, so that EEC and Packard could safely exchange confidential information in furtherance of the negotiations. (Rapoport Aff. para. 13) On March 15, 2005 at a meeting with its client Level 3 Communications, employees of Level 3 Communications raised questions about a possible EEC/Packard business partnership. Up to that point EEC had taken precautions to keep that information confidential and limited to officers of EEC. (Rapoport Aff. para. 14) On March 21, 2005 Packard attempted to recruit EEC's Mid-Atlantic Regional Manager, Eugene McNeil, by offering him employment as Packard's "Business Development Manager." (Rapoport Aff. para. 15).

As late as March 23, 2005, Emming performed service for EEC as an employee of EEC at Cingular's telecommunications site in Bolton, Massachusetts. (Rapoport Aff. para. 16) On March 28, 2005 Emming informed EEC that he was leaving EEC's employment[5]. On March 30, 2005, EEC was informed by an employee of its client, Cingular, that Emming was working for Packard, and that Packard was actively seeking to become an authorized Cingular technical service and maintenance vendor, in

[4]See in particular, 10/27/99 Memo of J. Harmon; Annual Performance Review for 1999-2000 by J. Peltier; Annual Performance Review for 2002-2003 by P. Iodice; and Annual Performance Review for 2003-2004 by P. Iodice. (Rapoport Aff. para. 12).

[5]From the date of his hire up to that time, Emming remained a Field Service Technician. His salary at the time of his resignation was $71,942.00. (Rapoport Aff. para. 17)

direct competition with EEC. (Rapoport Aff. para. 18)

EEC was later informed and believes that Emming was hired by Packard at a salary of $75,000.00 per year, with a $5,000.00 signing bonus and a 3% incentive fee for all EEC service contracts Emming is able to acquire for Packard in competition with EEC.[6] (Rapoport Aff. para. 19) To protect ECC's business interests, EEC filed this suit against Emming on April 26, 2005. Emming was served with the suit on May 6, 2005. (Rapoport Aff. para. 20).

## Argument

## Under Massachusetts Law This Court Should Enforce the Agreement and Issue a Preliminary Injunction

### A. Massachusetts law applies

Massachusetts law applies because the parties contractually agreed to a Massachusetts choice of law provision when they signed the non-compete agreement.[7] Massachusetts generally enforces a choice of law provision agreed to by the parties. *Roll Systems, Inc. v. Shupe, 1998 WL 1785455 (D. Mass. 1998); See also, Shipley Co., Inc. v. Clark, 728 F. Supp. 818, 825-826 (D. Mass. 1990).* If the defendant were to challenge the choice-of-law provision contained in the non-compete agreement, Massachusetts law would still apply where the agreement was signed and the defendant was hired in Massachusetts, and EEC's principal place of business is also in Massachusetts. *See, Dunfey v. Roger Williams Univ., 824 F. Supp. 18, 20 (D. Mass. 1993); See also Oxford*

---

[6]Emming admits this in his answer except for the 3% incentive fee.

[7]Paragraph 9 of the agreement, entitled "Choice of law," provides for the application of Massachusetts law. (Rapoport Aff. para. 6)

*Global Resources, Inc. v. Guerriero, 2003 WL 23112398 (D. Mass 2003) (listing factors of "most significant relationship" test in determining choice of law).* The defendant's resident state of Connecticut has no interest in determining the issue in this case whereas Massachusetts has an interest in protecting against breaches by former Massachusetts employees.

B. Standard under Massachusetts law

Under Massachusetts law, EEC is entitled to a preliminary injunction against defendant Emming because EEC can demonstrate that (1) it will suffer irreparable injury if an injunction is not granted, (2) the injury that EEC will suffer if an injunction is not granted outweighs any harm that Emming would suffer if the injunction is granted, (3) there is a likelihood that EEC will succeed on the merits at trial; and (4) the public interest will not be adversely affected if a preliminary injunction is granted. *Marcam Corporation v. Orchard, 885 F. Supp. 294, 297 (D. Mass. 1995)*; *Shipley Company, L.L.C. v. Kozlowski, 926 F.Supp. 28, 31 (D. Mass. 1996);Roll Systems, Inc. v. Shupe, 1998 WL 1785455, *1 (D. Mass. 1998); Ikon Office Solutions, Inc. v. Belanger, 59 F.Supp.2d 125, 128 (D. Mass. 1999).* Because EEC seeks to protect its legitimate business interests such as confidential information and its goodwill interests, EEC is entitled to injunctive relief enforcing its non-compete and non-disclosure agreement with Emming. Furthermore, because Emming willfully violated the non-compete agreement, EEC is entitled to have a one year injunction commence from the date the court grants relief rather than from Emming's departure from EEC or his violation of the agreement. *Modis, Inc. v. The Revolution Group, Ltd., 1999 WL 1441918, * 9 (Mass.Super. 1999).*

C. Application of the Standard

(1) EEC Will Suffer Irreparable Harm If Preliminary Injunctive Relief is Denied

EEC will suffer irreparable harm is injunctive relief is denied because Emming, as a Field Technician, was privy to highly confidential information regarding EEC's technical and business operations. The courts are aware of the importance of covenants where the former employee is in a position where he can harm the good will because of his knowledge of business secrets or confidential information. *All Stainless, Inc. v. Colby, 364 Mass. 773, 779-80 (1974).*

*Marcam Corporation v. Orchard* recognized that non-competition agreements are especially critical to companies who are involved with specialized programs and whose employees are required to intimately know the program's strengths and weaknesses. *Marcam Corporation v. Orchard, 885 F. Supp. 294.* This court stated that the harm to the employer "cannot be avoided simply by the former employee's intention not to disclose confidential information" because the employee does not go with a *"tabula rasa"* with respect to the former employees products. *Id. at 297.* Regardless of intent, any confidential information Emming knows regarding EEC's technical services and business operations is bound to influence what he does for J.T. Packard, and to the extent it does, EEC will be disadvantaged. *Id.*[8]

EEC also has a legitimate interest in protecting the goodwill of its customers. *Wells v. Wells, 9 Mass.App.Ct. 321, 400 N.E.2d 1317, 1319 (1980).* Emming's current employment with one of EEC's biggest competitors will harm EEC's goodwill because

[8]It appears that subsequent to Emming's departure, Packard somehow obtained and was using confidential cellular telephone numbers to contact EEC employees. (Rapoport Aff. para. 8) Information regarding confidential business discussions was also being disclosed shortly before Emming left EEC. (Rapoport Aff. paras. 13, 14)

EEC's customers knew and relied upon Emming in servicing systems. EEC Field Technicians develop and maintain a unique relationship with EEC's customers. The Field Technician is most often the only contact a customer has with EEC. EEC Field Technicians are often at the customer's facility during times of crisis for the customer. As a result, a Field Technician's relationship with the customer is typically stronger than EEC's relationship with the customer. Therefore, Emming's departure from EEC will likely harm EEC's reputation to its customers, and lead to a loss of business to EEC. *Marcam, 885 F.Supp. at 298*. By promoting JT Packard's competing service product, Emming would be directly or indirectly disparaging EEC's service products. *Id.* It is well settled law that a non-competition agreement may be enforced to protect a company's reputation and customer relationships.[9] *Marcam, 885 F.Supp. at 298 citing New England Tree Expert Co. v. Russell, 306 Mass., 504, 28 N.E.2d 997, 1000 (1940), Kroeger v. Stop & Shop, 13 Mass.App.Ct. 310, 432 N.E.2d 556, 570 (1982).*

Finally, when Emming voluntarily executed the non-compete agreement as a condition of employment, he specifically acknowledged in paragraph 3 of the agreement that EEC would be irreparably harmed in the event of its breach. Emming should not now be permitted to ignore or disavow that acknowledgment.

(2) The Balance of the Equities Weigh in Favor of Granting a Preliminary Injunction Because the Agreement was Reasonable and Emming Will Not Be Harmed by Its Enforcement

Economic hardship to an employee is not a basis for barring a reasonable covenant not to compete. In *Marine Contractors v. Hurley*, the Supreme Judicial Court dismissed an employee's claim that his non-compete agreement imposed an undue hardship by barring

---

[9]It also appears that Emming's employment by Packard was being used as a device to "steal" at least one of EEC's customers, Cingular. (See, Rapoport Aff. paras. 16-18)

him from earning a living in the marine contracting business, the business he knew best. *Marine Contractors v. Hurley 356 Mass 280, 289, 310 N.E.2d 95 (1974).* As stated by the Massachusetts Supreme Judicial Court:

> The consequence of every covenant not to compete . . . is that the [employee] is deprived of a possible means of earning his living, within a defined area and for a limited time. This fact alone does not make such covenants unenforceable especially where no extraordinary hardship is displayed and where the agreement was freely entered into by the employee. *Marine Contractors Co., 356 Mass. at 289.*

Emming is free to seek employment of his skills at any endeavor not in direct competition with EEC. *See, Bard Inc. v. Intoccia, 1994 WL 601944 *3 (D. Mass.).* Moreover, it is was Emming who knowingly made the choice to execute the non-compete agreement as a condition to his employment by EEC. No one forced him to do so.

(3) <u>EEC Has Established a Likelihood of Success on the Merits of Its Claim</u>

EEC has demonstrated a likelihood of success on the merits of its claim because the non-compete agreement is reasonable in scope, and because it protects EEC's legitimate customer good will interests and its confidential information. And, Emming's conduct warrants the injunctive relief sought, because he willfully breached a covenant not to compete knowingly and freely entered into by him as a condition of employment by EEC. It is well settled law in Massachusetts that a non-competition agreement is valid and enforceable in equity if "it is necessary for the protection of the employer, is reasonable limited in time and space, and is consonant with the public interest." *Novelty Bias Binding Co. v. Shevrin, 342 Mass. 714, 716 (1961); Loranger Construction Co. v. C. Franklin Corporation, 355 Mass. 727, 730 (1969).*

(a). <u>The Non-Competition Agreement is Supported by Valid Consideration</u>

EEC entered into a valid and reasonable non-compete agreement with Emming in exchange for EEC's continued employment of Emming as an employee-at-will. In Massachusetts, employers may lawfully seek to restrict post-employment competitive activities of an at-will employee through a non-competition agreement. *Augat, Inc. v. Aegis, Inc., 409 Mass. 165, 172(1990); All Stainless, Inc. v. Colby, 364 Mass. at 778.* It was Emming who sought employment from EEC. Two weeks prior to EEC hiring Emming, EEC notified Emming in writing that he would have to execute a non-compete agreement as a condition of employment. EEC then required that Emming sign the agreement in exchange for his continued employment as an employee at will. Emming knowingly and voluntarily entered into the agreement and, as a result, maintained his employment at EEC. Employment, as well as continuation of employment, is valid consideration to render such an agreement enforceable. *Wilkinson v. QCC, 53 Mass.App.Ct. 1109 (2001).*

(b) <u>EEC Is Entitled to Protect Its Customer Good Will and Confidential Information Through Its Reasonable Non-Compete Agreement</u>

A non-competition agreement will be enforced to the extent that it is necessary to protect the employer's good will, trade secrets, or confidential information. *Evans v. Certified Engineering & Testing Co., Inc, 834 F. Supp. 488, 501 (D. Mass 1993); New England Canteen Service v. Ashley, 372 Mass. 671, 674 (1977).*[10] The test in all cases is reasonableness of the restrictions as to time and space which is a factual determination. *New England Tree Expert Co., v. Russell, 306 Mass. 504, 511 (1940); See also, All*

[10] The SJC formed the rule that "if any or all of these interests are present in a given case in which a non-competitive covenant is part of a contractual agreement and absent equitable factors which would militate against enforcement, a court in equity will not deny enforcement of a reasonable covenant."

*Stainless, Inc. v. Colby, 364 Mass. at 778 (covenants will be enforced if reasonable based on all the circumstances).*

EEC's agreement is reasonable because it is tailored to any area where EEC conducts its business. *Kroeger v. Stop & Shop, 432 N.E.2d at 570.* If the facts warrant it, the relief granted to the employer may enjoin the employee from competing with the plaintiff in *any* territory in which the employer carries on his business. *Id. at 511; See also, Novelty Bias Bindings Co., 342 Mass. at 377 (holding geographical restriction covering 26 states reasonable).* EEC's business is nationwide in twenty one (21) different states from coast to coast. This Court has held that a nationwide geographic restriction in a non-compete agreement is reasonable so long as it restricts a former employee from doing business in an area in which the company itself conducts business. *Marcam Corporation v. Orchard, 885 F. Supp. 294 at 299 citing Kroeger v. Stop & Shop, supra, 432 N.E.2d at 570.*

EEC's agreement with Emming is reasonable in scope, because it is narrowly limited to direct competition for the term of one year. Even if this Court found the agreement to be overly broad, an agreement that is overly broad in scope is not invalid, rather the court will reform the contract to the extent necessary to afford the employer protection. *Cedric G. Chase Photographic Laboratories, Inc. v. Hennessy et al., 327 Mass. 137, 139 (1951).*

(4) <u>Public Interest Strongly Favors Enforcement of the Non-Compete Agreement and Issuance of a Preliminary Injunction</u>

The public interest will be served in granting the preliminary injunction because "it is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted" and "allowing an individual to disregard such a promise would

result in behavior which should not be condoned or encouraged." *Shipley Company, L.L.C. v. Kozlowski, 926 F.Supp. 28, 31 (D. Mass. 1996).*

Conclusion

For the reasons stated above, plaintiff urges that this Court allow its motion.

ELECTRONIC ENVIRONMENTS CORPORATION
By its Attorney,

/s/ Leo S. McNamara

Leo S. McNamara, Esq.
BBO # 339380
McNAMARA & FLYNN, P.A.
84 State Street, 9th Floor
Boston, MA 02109
(617) 723-3344

Dated: October 28, 2005