UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ELECTRONIC ENVIRONMENTS CORPORATION,

               Plaintiff,

    v.

                                      Case No. 05-11093-NG

JAMES M. EMMING,

               Defendant.

**DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION**

## <u>INTRODUCTION</u>

      Defendant James M. Emming is a former employee for Plaintiff Electronic Environments Corporation ("EEC").  At the commencement of his employment with EEC as a Battery Technician, Mr. Emming signed a Non Competition and Confidentiality Agreement prohibiting him from competing with EEC anywhere EEC does business for one year following Mr. Emming's termination from employment with EEC.  Mr. Emming did not sign a new non-compete agreement when he obtained a promotion which constituted a material change in his employment with EEC.

      Mr. Emming gave his two-week notice to EEC on March 28, 2005.  By March 30, 2005, EEC learned that Mr. Emming had accepted a position with JT Packard & Associates, Inc. ("JT Packard")  On April 2, 2005, Kenneth Rapoport, founder and President of EEC, met with Mr. Emming to discuss his termination from employment with EEC.  Mr. Emming told Mr. Rapoport that for one year following his termination from EEC's employment he would only service existing customers of JT Packard, and

that he would not solicit EEC's customers or work for any of EEC's customers.

Despite knowing that Mr. Emming was not competing with EEC for customers and despite the fact that EEC has not attempted to enforce its non-compete agreement when more senior employees have left EEC to work for competitors, EEC filed suit against Mr. Emming on April 26, 2005, alleging a breach of the non-compete agreement. Despite its request for a temporary injunction and claim of "irreparable harm," EEC did not seek injunctive relief until October 28, 2005, *seven months* after Mr. Emming's employment ended and over *six month* after EEC filed suit in the first place. EEC's Motion seeks an injunction prohibiting Mr. Emming from working for JT Packard until March 28, 2006, which is less than four months from the date of filing this Brief.

## FACTUAL BACKGROUND

Mr. Emming became employed as a Battery Technician for EEC in June of 1999. (Id. at ¶ 5.)  Contrary to Mr. Rapoport's Affidavit, Mr. Emming's agreement with EEC makes clear that he was hired as a Battery Technician, not a UPS service technician. (Rapoport Aff. at Exh. A.)   In the position of Battery Technician, Mr. Emming performed work only on batteries for customers of EEC.  (Emming Aff. at ¶ 5.)

In approximately November of 1999, after working exclusively as a Battery Technician for EEC, Mr. Emming received a promotion to UPS Technician, the title of which ultimately changed to Power Electronics Technician I.   (Id. at ¶ 6.)   In that position, Mr. Emming's duties expanded to include service of UPSs, which was a material change in his job responsibilities.  (Id.)  Prior to his promotion, Mr. Emming did not perform work on UPSs.  (Id.)  After his promotion, Mr. Emming was placed in the on-call rotation and received a company van and tools, which he did not have before the

promotion.  (Id.)  At the time Mr. Emming received his promotion, he was not asked to sign nor did he sign a new non-compete agreement with EEC.  (Id. at ¶ 8.)

After Mr. Emming received the promotion from Battery Technician to Power Electronic Technician I and during his remaining employment, even though his job title changed several times, his job responsibilities stayed virtually the same.  (Id. at ¶ 9.)  His duties involved service of UPSs and related equipment for customers of EEC.  (Id.)

At all times during his employment with EEC, Mr. Emming was paid on an hourly basis.  (Id.)  While he received overtime pay for hours he worked in excess of 40 per week, he was never guaranteed overtime or even 40 hours per week.  (Id.) During his employment with EEC, Mr. Emming did not have the responsibility to review and monitor the performance of other employees.  (Id. at ¶ 10.)

As a technician for EEC, Mr. Emming's role was to show up at the customer's site, service the UPS equipment and leave, which is no different than a technician who is sent to service a home appliance.  (Id. at ¶ 21.)   Throughout Mr. Emming's employment with EEC, he was not responsible for recruiting new customers for EEC or soliciting renewals of contracts from existing EEC customers.  (Id. at ¶ 17.)  Mr. Emming was not involved in any way in negotiation of contracts for EEC.  (Id.)  Regional Managers at EEC have direct relationships with EEC's customers and are responsible for acquiring customers and renewing contracts with existing customers.  (Id. at ¶ 16.)

Throughout his employment with EEC, Mr. Emming was not the sole or even primary contact from EEC with its customers.  (Id. at ¶ 18.)  While he had a contact person for each customer site, 90% of the time his contact was with a facilities worker, not the person who made decisions for the customer regarding entering into or renewing a

3

contract with EEC.  (Id.)

The only customer information Mr. Emming obtained from EEC was the customer name, address, site contact and, for some customers, his contact's phone number (again, 90% of the time this was a facilities worker, not the decision maker).  (Id. at ¶ 19.)  The identity of EEC's customers is certainly not confidential; EEC's customers are listed on EEC's website.  (Id.)  Further, except on rare occasion, Mr. Emming did not have access to "decision makers' and influencers' names, their direct phone numbers and even mobile/cell numbers."  (Id. at ¶ 20.)  EEC took great lengths to keep this kind of information from its technicians, including Mr. Emming.  (Id.)

Contrary to Mr. Rapoport's Affidavit, Mr. Emming did not have access to or knowledge of information about a customer's contract, including the length of the contract, start and end dates, and pricing.  (Id. at ¶ 22.)  This information was also kept secret from technicians, including Mr. Emming.  (Id.)  The "confidential" part of the customers' contracts including length, start and end date and price, were redacted by EEC at times when technicians including Mr. Emming were shown copies of contracts.  (Id.) EEC went to great lengths to keep this kind of information from its technicians.  (Id.)

Since EEC is not a manufacturer of UPS equipment, but only services such equipment, EEC utilizes the service manuals that the manufacturers produce.  (Id. at ¶ 23.)  Contrary to Mr. Rapoport's Affidavit, EEC has no equipment manuals or training materials other than what it has acquired from technicians and through other sources that are created by the various UPS manufacturers themselves, not EEC.  (Id.)

EEC has an extremely high turnover of personnel.  (Id. at ¶ 14.)  In the five years Mr. Emming worked for EEC there were 15 different technicians in his power electronics

4

group, and only five when he left.  (Id.)  Despite the high turnover of personnel within Mr. Emming's group, not one EEC customer in Mr. Emming's group cancelled their contract with EEC because a technician left EEC.  (Id. at ¶ 15.)

Mr. Emming is the only former EEC employee who has left to work for a competitor of EEC who EEC has sought enforcement of its non-compete agreement.  (Id. at ¶ 12.)  Several service technicians more senior to Mr. Emming as well as Regional Managers have left EEC to work for competitors of EEC and were never sued by EEC. (Id. at ¶ 13.)  Four examples of EEC's former employees who have left to work for competitors are set forth in Paragraph 13 of Mr. Emming's Affidavit.  (Id.)

Mr. Emming left EEC's employment because EEC did not comply with its agreement to review his rate of pay annually on his anniversary date.      (Id. at ¶ 27; Rapoport Aff. at Exh. A.)  At one time, EEC adjusted the anniversary dates for employees three months in advance in order to save money.  (Emming Aff. at ¶ 27.)  In addition, Mr. Emming's performance reviews were constantly late.  (Id.)  His September 2004 performance review was not completed until December of 2004, and though his hourly wage was increased with that review, the rate increase was not back-dated to his anniversary date even though this was done for other employees.  (Id.)  In January of 2005, Mr. Rapoport promised to take care of this apparent error but failed to do so any time prior to Mr. Emming's termination of employment with EEC.  (Id.)

When Mr. Emming spoke with Peter Drumm, General Manager for JT Packard, about possible employment with JT Packard, Mr. Drumm informed him that JT Packard had an immediate need to service existing JT Packard customers' UPS needs because JT Packard had lost an employee, and therefore needed someone to take over service of

those existing customers.  (Id. at ¶ 29; Drumm Aff. at ¶ 3.)  Before Mr. Emming accepted JT Packard's offer of employment, he informed Mr. Drumm that for the first year after his employment with EEC ended he would only work for existing JT Packard customers, and that he would not solicit EEC's customers or employees or aid JT Packard in doing so.  (Emming Aff. at ¶ 30; Drumm Aff. at ¶ 4.)

On March 28, 2005, Mr. Emming notified EEC that he was terminating his employment with EEC.  (Emming Aff. at ¶ 31.)  After giving notice, Mr. Emming was called into a meeting with Mr. Rapoport at which time Mr. Rapoport told Mr. Emming he should be careful because he has a family to take care of and that it is expensive to hire a lawyer.  (Id.)  Mr. Rapoport also said he would hate to see Mr. Emming get caught in the middle of a company war between EEC and JT Packard.  (Id.)  In that meeting, Mr. Emming told Mr. Rapoport that he was going to uphold his agreement with EEC because he was only going to service JT Packard's existing customers over the next year, and that he would not solicit EEC's customers.  (Id. at ¶ 32.)

When Mr. Emming left his employment with EEC, he turned in absolutely everything that was given to him by EEC, including his contact information for customers whom he serviced and his laptop.  (Id. at ¶ 24.)  The laptop included various forms that EEC uses in its business, and that was returned at the end of his employment.  (Id.)  The only thing Mr. Emming took with him when he left EEC's employment is the knowledge he gained from years of education, training and work experience.  (Id. at ¶ 25.)

It has now been over eight months since Mr. Emming left employment with EEC.  (Id. at ¶ 33.)  Not once has Mr. Emming worked for a customer of JT Packard who was

not already a customer of JT Packard when he began his employment with JT Packard. (<u>Id.</u>; Drumm Aff. at ¶ 6.)  He has not worked at any customer sites for JT Packard that he previously worked on for EEC or even that he knew were customers of EEC.  (Drumm Aff. at ¶ 6.)  In those eight months, Mr. Emming has not solicited work from EEC's customers for JT Packard or assisted JT Packard is doing so, or provided any leads for any customers to JT Packard.  (Emming Aff. at ¶ 34-35; Drumm Aff. at ¶ 6.)

## ARGUMENT

A party moving for a preliminary injunction must establish the following before that relief may be granted: (1) that the movant will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm that the opposing party would suffer if the injunction were granted; (3) that there is a likelihood that the movant will succeed on the merits at trial; and (4) that the public interest will not be adversely affected if the injunction is granted.  *Jackson v. Fair*, 846 F.2d 811, 814-15 (1st Cir. 1988).  In addition, because a preliminary injunction is an equitable remedy, "a court may properly consider any inequitable conduct by the plaintiff."  *Hannon v. Allen*, 241 F. Supp. 2d 71, 73 (D. Mass. 2003).

EEC has failed to establish these necessary elements for obtaining injunctive relief.  Further, EEC's inequitable conduct precludes the Court from granting the relief EEC seeks.  Accordingly, EEC's Motion for Preliminary Injunction should be denied.

## I.  EEC'S MOTION FOR PRELIMANRY INJUNCTION SHOULD BE DENIED BECAUSE EEC HAS NOT ESTABLISHED IRREPARABLE HARM.

In order to obtain injunctive relief, EEC must show that it is "likely to suffer irreparable injury before a decision is rendered on the merits."  *See Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991).  EEC must establish "injury that is not

remote or speculative, but is actual and imminent." *See id.*

"Unexplained delay in seeking relief for allegedly wrongful conduct may indicate an absence of irreparable harm and may make an injunction based upon that conduct inappropriate." *See Exeter Group, Inc. v. Sivan*, 2005 WL 1477735, *6 (Mass. Super.), *citing Alexander & Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 494-95 (1986). In *Exeter*, the Court held that the lack of urgency (from late 2004 until February 2005) in moving for a preliminary injunction belied the contention that irreparable harm would result in the absence of injunctive relief. *Id. See also* Laurence H. Reece, III, Noncompetition Agreements, MA-CLE 10-1, § 10.5.10(b) (2004)("If an employer waits several weeks or months to seek preliminary injunctive relief, the Court may deny its request to enter a preliminary injunction to enforce a noncompetition agreement.")

As set forth above, Mr. Emming's non-compete agreement with EEC has a one year term. Mr. Emming's employment with EEC ended on March 28, 2005. EEC filed suit against Emming on April 26, 2005, yet EEC did not seek relief on its claim against Mr. Emming until October 28, 2005, seven months after Mr. Emming's employment ended and over six month after Plaintiff filed suit in the first place. EEC provides absolutely no explanation for its delay, and no sufficient justification exists. (Emming Aff. at ¶ 39.) As in *Exeter*, given EEC's unreasonable and inexplicable seven month delay in moving for injunctive relief, its claim of irreparable harm is nothing more than a veiled attempt to prohibit ordinary competition as explained more fully below.

Further, EEC has not proven any damage whatsoever from Mr. Emming's almost eight month employment with JT Packard. Mr. Emming is now eight months into the

term of his twelve month non-compete agreement.  EEC has not offered one customer who has left  EEC or has even threatened to do so because of Mr. Emming's departure. In fact, EEC has extremely high turnover of UPS service technicians, some of whom went to work for competitors, and yet not one customer has left EEC in Mr. Emming's group because of the departure of a technician.

EEC has not offered one EEC customer who Mr. Emming has worked for since his departure from EEC.  EEC has not offered one customer who Mr. Emming solicited for JT Packard.   EEC has not even offered any customer that it lost to JT Packard, regardless of Mr. Emming's involvement with such customer.  The most EEC has offered is that fact that Mr. Rapoport was told by another EEC employee who was in turn told by an employee of Cingular that JT Packard was actively seeking to become an authorized Cingular vendor.  Not only is this double hearsay, and should therefore be disregarded, but Mr. Emming's employment with JT Packard had nothing to do with JT Packard's efforts to solicit Cingular as a client.  JT Packard has been actively soliciting Cingular for over two years, long before Mr. Emming's employment began.  (Drumm Test. at ¶ 8.) Even so, EEC has not established that it has lost Cingular as a client to JT Packard.

Nor has EEC proven potential future harm.  EEC claims that Mr. Emming was privy to confidential information and because he had a relationship with customers, EEC *may* lose customers.  This claimed harm is pure speculation, and cannot form the basis for a finding of irreparable harm.  Moreover, Mr. Rapoport's assertions about the extent of Mr. Emming's knowledge of alleged confidential information is simply not true.

Mr. Emming only had access to customer name (which EEC posts on its website), address, contact person and sometimes a phone number.  He had nothing more.  Since

EEC lists its customers on its website, its customers' addresses and phone numbers can be found via the internet or telephone book.  The only information known to Mr. Emming that was not available by public sources was, at times, a contact name.  Mr. Emming's limited knowledge of some the contacts for the customers *whom* he serviced certainly does not establish that allowing Mr. Emming to work for JT Packard for JT Packard's existing clients *who are not clients of EEC's* will irreparably harm EEC.

Contrary to Mr. Rapoport's Affidavit, Mr. Emming did not have access to contract information, including price, term, and start and end date.  This  information was always redacted when Mr. Emming received a copy of a customer contract.  Ninety percent of Mr. Emming's customer contacts were not decision makers, but facilities workers.  Mr. Emming was a technician: he did his job and, admittedly, he did it well.  But he did not have any role whatsoever in discussions with customers about contracts, renewals, or price.  To suggest his role was anything more than a service technician is at best a gross exaggeration and at worst a fabrication.

EEC certainly cannot prove irreparable harm in light of Mr. Emming's employment with JT Packard, which has been limited to service of long-time, existing customers of JT Packard, which will continue for one year after Mr. Emming's departure from EEC.  EEC knew as much; Mr. Emming told Mr. Rapoport before he started work for JT Packard that he would only be servicing existing JT Packard customers and would not even attempt to solicit any EEC customers.  EEC has failed to explain how it will be harmed when Mr. Emming is only working for customers of JT Packard's who had been JT Packard customers even before Mr. Emming began his employment with JT Packard.

Because there is no evidence of irreparable harm and because of EEC's substantial delay in filing a motion for injunctive relief, EEC's Motion should be denied.

## II.   **EEC'S MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED BECAUSE EEC IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM AGAINST MR. EMMING.**

While covenants not to compete may be enforced in limited circumstances to protect the legitimate business interests of the employer, they are not favored and may not be used to restrain free competition or to deprive the employee of the opportunity to use acquired skills and knowledge to secure other employment. *New England Canteen Servs. v. Ashley*, 371 Mass. 671, 674 (1977); *Marine Contractors Co., Inc. v. Hurley*, 365 Mass. 280, 287-88, 310 N.E.2d 915 (1974). The reason for this rule is based on sound public policy considerations which favor every person carrying on his trade or occupation freely. *Commonwealth v. CRINC*, 392 Mass. 79, 87-88, 466 N.W.2d 792 (1984). Employee covenants not to compete "are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through the loss of his livelihood." *Sentry Ins. Co. v. Firnstein*, 14 Mass. App. Ct. 706, 707 (1982); *Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 496 (1986) (close scrutiny warranted because "an . . . employee typically has only his own labor or skills to sell and often is not in a position to bargain with his employer.")

A restrictive covenant between an employer and an employee may be enforced where the employer can show that the agreement is: (1) necessary to protect a legitimate business interest of the employer; (2) supported by consideration; (3) reasonably limited in all circumstances including time and space; and (4) otherwise consonant with public

policy.  *All Stainless, Inc. v. Colby*, 364 Mass. 773, 777-78 (1974).

EEC has failed to establish these necessary elements that are required to prove a likelihood that it will succeed on the merits of its claim against Mr. Emming.  Therefore its Motion for Preliminary Injunction should be denied.

**A.    EEC's Non-Compete Agreement Is Not Necessary To Protect EEC's Legitimate Business Interests.**

Trade secrets, confidential data and goodwill are legitimate business interests of an employer that it may seek to protect by a restrictive covenant.  *New England Canteen Servs., Inc.*, 372 Mass. at 674.  However, protection from "ordinary competition" is not a legitimate business interest.  *Marine Contractors Co.*, 365 Mass. at 287-88.  Nor may an employer prevent an ex-employee from using "the general skill or knowledge acquired during the course of the employment."  *Junker v. Plummer*, 360 Mass. 76, 79, 67 N.E.2d 667 (1946).  An employee may take personal skill that was earned before arrival, even if the skill was enhanced while employed.  *Junker v. Plummer*, 320 Mass. 76, 79, 67 N.E.2d 667 (1946); *Dynamics Research Corp. v. Analytical Sciences, Co.*, 9 Mass. App. Ct. 254, 274-75, 400 N.E.2d 1274 (1980).

An employer's goodwill consists of its "positive reputation in the eyes of its customers or potential customers . . . [and] is generated by repeat business with existing customers or by referrals to potential customers."  *Marine Contractors Co.*, 365 Mass. at 287-89.  In order for an individual to infringe on the former employer's goodwill, that individual must be "in a position . . . to develop close relationships with a wide range of [the employer's] customers or suppliers."  *All Stainless, Inc.*, 364 Mass. at 77; *Oxford Global Resources, Inc. v. Guerriero*, 2003 WL 23112398, at *7; *Flexcon Co., Inc. v. McSherry*, 123 F. Supp. 2d 42, 45 (D. Mass. 2000).  In other words, goodwill applies to

customer relationships for employees who have the capacity to injure goodwill by trading on relationships properly belonging to the former employer. *Kroeger v. Stop & Shop Co.*, 13 Mass. App. Ct. 310, 316 (1982). Goodwill attaches to employees who have "substantial contact with decisionmakers in the clients of his former employer" who could use the relationships to injure the former employer's goodwill. *Hurwitz Group, Inc. v. PTAK*, 2002 WL 32717868, *3 (Mass. Super.).

A non-competition clause may only protect the employer's goodwill, not appropriate the goodwill of the employee. *Sentry Ins. v. Firnstein*, 14 Mass. App. Ct. 706, 707, 442 N.E.2d 46 (1982). Furthermore, customer relationships themselves are not protectible. *Slad Gorton & Co. v. O'Neill*, 355 Mass. 4, 9, 242 N.E.2d 551 (1968).

EEC's claim for protection of its goodwill is simply not supported by the facts of this case. As set forth above, Mr. Emming did not have "substantial contact with decisionmakers in the clients of his former employer" in order to use his relationships to injure EEC. *See Hurwitz Group, Inc.,* 2002 WL 32717868, *3. He was an entry level, hourly employee whose primary contact was with a facilities worker who was <u>not</u> the customers' decision maker. His contact was limited to doing the work and leaving the site. He did not solicit new customers for EEC or solicit renewals from existing customers. He did not even know the price or term of existing customers' contracts. He simply was not in a role such that his employment with JT Packard would infringe on EEC's goodwill, especially when his work for JT Packard is limited to service of its pre-existing customers who are not customers of EEC.

Nor does Mr. Emming have confidential information that would justify

protection. As set forth more fully above, the only information Mr. Emming had that was not available to the public was a contact name at certain sites. EEC has failed to establish how having a contact's name, 90% of whom are not decision makers, constitutes a legitimate business interest justifying enforcement of the non-compete agreement. Even so, EEC has produced no evidence (and none exists) that Mr. Emming has disclosed to anyone this confidential information.

The only thing Mr. Emming took with him when he left EEC was what was in his head. Massachusetts law is clear that an employer may not prevent a former employee from using "the general skill or knowledge acquired during the course of the employment." *Junker*, 360 Mass. at 79. That is all Mr. Emming has done: he is using all of his education, training and experience, including his experience working for EEC, in servicing UPSs for JT Packard's customer who are not customers of EEC. EEC cannot use the non-compete agreement to protect itself from ordinary competition, which is exactly what it is trying to do in this case. EEC has failed to establish that enforcement of the non-compete agreement against Mr. Emming is necessary to protect its interests.

**B.    EEC's Non-Compete Agreement Is Not Supported By Consideration.**

In order for a restrictive covenant to be enforceable, it must be supported by consideration. *F.A. Bartlett Tree Expert Co. v. Barington*, 353 Mass. 585, 587-88 (1968). Each time an employee's employment relationship with the employer changes materially such that they have entered into a new employment relationship, a new restrictive covenant must be signed. *Lycos, Inc. v. Jackson*, 18 Mass. L. Rptr. 256, 2004 WL 2341335, *3 (Mass. Super. Ct. 2004), citing *Marine Contractors Co.*, 365 Mass. at 285-86; *F.A. Bartlett Tree Expert Co.*, 353 Mass. at 587-88; *ASC Cable Sys.*

14

*v. Clisham*, 62 F. Supp. 2d 167, 173 (D. Mass. 1999); *Cypress Group, Inc. v. Stride & Assocs., Inc.*, 17 Mass. L. Rptr. 436, 2004 WL 616302, *3 (Mass. Super. Ct. 2004).

In *Lycos, Inc.*, the court found the material change in the employer's relationship with the employer voided the previous non-compete agreement, and because the employee did not sign a new non-compete agreement, Plaintiff's motion for injunctive relief to enforce the old agreement was denied. 2004 WL 2341335 at *3. Similarly, in *Cypress Group, Inc.*, the court found insufficient consideration based on the fact that the employees' promotions created new employment relationships which required the employees to sign new restrictive covenants. 2004 WL 616302 at *3-4.

Similarly, Mr. Emming's title, salary, and responsibilities changed materially after his November 1999 promotion from Battery Technician to Power Electronics Technician I. Prior to his promotion, Mr. Emming did not have a company car or company tools. Despite the material change in his employment, Mr. Emming did not sign a new non-compete agreement. Accordingly, no non-compete agreement now exists between the parties and Plaintiff's Motion for Injunctive Relief should be denied.

## C.  EEC's Non-Compete Agreement Is Not Reasonably Limited In All Circumstances Including Its Geographic Restriction.

A restrictive covenant will only be enforced if it is reasonable based on all of the circumstances. *All Stainless, Inc.*, 364 Mass. at 778; *Sherman v. Pfefferkorn*, 241 Mass. 468, 474 (1922). In making this determination, the reasonable needs of the former employer for protection from harmful conduct of the former employee must be weighed against the reasonableness of the restraint imposed on the former employee and the public interest. *All Stainless, Inc.*, 364 Mass. at 778.

Non-compete agreement must be reasonable in geographic scope. *Blackwell v.*

*E.M. Helides, Jr., Inc.*, 368 Mass. 225, 228 (1975). "An unlimited or world-wide area is not acceptable." *Speechworks Int'l, Inc.*, 2002 WL 31480290, at * 4 (Mass. Super.) Plaintiff cites *Kroeger v. Stop & Shop*, 13 Mass. App. Ct. 310, 432 N.E.2d 566 (1982), for the proposition that a national non-compete agreement is valid "if the facts warranted." (Pl.'s Br. at 13.) In *Kroeger*, the Massachusetts Appeals Court said that "[r]estraints upon the competitive activity of a *key executive* may range beyond the precise geographic area of activity at the time of the employee's departure." *Id.* at 570. (emphasis added.) Plaintiff also cites District Judge Lindsay's Decision in *Marcam Corp. v. Orchard*, 885 F. Supp. 294, 299 (D. Mass. 1995) for the same proposition. In *Marcam Corp.*, the court quoted the proceeding quotation from the *Kroeger* decision and applied it to a former employee who was the *Vice President of Development* for the former employer.

Unlike the employees in *Kroeger* and *Marcam Corp.*, Emming was not a key executive or even a manager or supervisor for EEC. Mr. Emming was an entry level service employee. He was paid on an hourly basis and received overtime compensation. He did not supervise other employees. He was not responsible for recruiting new customers or soliciting renewals of contracts from existing customers, and was not involved in negotiating contracts for EEC. EEC kept information about customer's contracts including term, start and end date and price confidential; Mr. Emming had no knowledge of the same. Mr. Emming was not the sole or even primary contact from EEC with the decision makers for EEC's customers. In fact, his primary contact with 90% of EEC's customers was with a facilities worker, not the decision maker. The facts of this case are nowhere near analogous to the facts of *Kroeger* and *Marcam Corp.*, which were

limited to key executives with extensive knowledge of their former employer's confidential business information and strategy and with the power to effect profits based on their relationships with customers.

EEC provides no justification based on the facts of this case why Mr. Emming should be prevented from competing with EEC everywhere EEC does business. More problematic, however, is the fact that EEC fails to even identify the geographic scope of Mr. Emming's work for EEC, and has provided no proof that his work for JT Packard is within the same geographic area in which he worked for EEC. EEC has the burden of proof as the movant. It has failed to establish a reasonable geographic limitation for Mr. Emming's non-compete agreement, and therefore it is not likely to succeed on the merits of its claim against Mr. Emming.

EEC's non-compete agreement is also unreasonable in that it prevents Mr. Emming from working for any competitor of EEC regardless of Mr. Emming's position with that competitor. The agreement effectively precludes Mr. Emming for working as a janitor for JT Packard, which is not reasonable under any standard. Mr. Emming could work for an EEC competitor but in a position that does not in any way invade the claimed interests that EEC seeks to protect, that is Mr. Emming's customer contacts and potential loss of those customers. Because EEC's non-compete agreement is not reasonably limited in all circumstances including its geographic, EEC's Motion for Preliminary Injunction should be denied.

### D.    EEC's Material Breach of Its Agreement with Mr. Emming Discharges Mr. Emming's Obligations Under The Non-Compete Agreement.

"It is well established that a material breach by one party excuses the other party from further performance under the contract." *Ward v. American Mut. Liab. Ins. Co.*, 15

Mass. App. Ct. 98. 100, 443 N.E.2d 1342 (1983). A material breach of an employment agreement by an employer may discharge an employee from further obligation under a non-compete provision of that agreement. *Id.* at 101, 443 N.E.2d 1342.

EEC committed a material breach of its agreement with Mr. Emming when it failed to comply with its agreement to review his rate of pay annually on his anniversary date. Mr. Emming's offer of employment clearly stated that "your rate [of pay] will be reviewed annually on the anniversary of your starting date." (Rapoport Aff. at Exh. A.) Mr. Emming's rate of pay was not reviewed annually on his anniversary date. In fact, at one time, EEC adjusted the anniversary dates for employees including Mr. Emming three months in advance in order to save money. Even when his review was conducted late, his rate increase was not back-dated to his anniversary date, even though this was done for other employees. EEC materially breached its agreement, which under *Ward* discharges any obligations Mr. Emming may have under the non-compete agreement.

**III.   EEC'S MOTION FOR PRELIMANRY INJUNCTION SHOULD BE DENIED BECAUSE EEC HAS FAILED TO ESTABLISH THAT ANY HARM THAT MAY FALL TO EEC OUTWEIGHS THE HARM TO MR. EMMING IF THE INJUNCTION WERE GRANTED.**

In *Robert Half Int'l Inc. v. Buoncontri*, 15 Mass. L. Rptr. 742, 2003 WL 915181, at * 4 (Mass Super.), the Court found that the balance of harms favored the employee where the employer failed to show that the employee had disclosed confidential information concerning the former employer's customers, accounts, marketing plans, or even the employer's business practices. The Court also relied on the employee's representation that he did not contacted his former employer's customers. *Id.* The Court then found that enforcement of the non-compete agreement would cost the employee his job which would impose a significant hardship on him. *Id.*

As set forth above, EEC has proven no harm whatsoever even after 75% (eight out of twelve months) of the term of the non-compete agreement has expired. EEC's claimed irreparable harm is speculative and not supported by the evidence in this case. Even if there was proof of irreparable harm, the Court must balance that harm against the harm to Mr. Emming. EEC suggests that Mr. Emming will not be gravely harmed because he could find another job. Yet the UPS service industry is Mr. Emming's chosen profession, and no employer would offer Mr. Emming a job knowing his intent to return to his chosen profession in less than four months. Entering an injunction against Mr. Emming will effectively force he and his family to live on unemployment for four months. Since Mr. Emming services long-standing customers for JT Packard, JT Packard would have to replace Mr. Emming, and Mr. Emming's long term employment would be at risk. As in *Robert Half Int'l Inc.*, the balance of harms favors Mr. Emming, and therefore EEC's Motion should be denied.

## IV.   EEC'S INEQUITABLE CONDUCT PRECLUDES ITS REQUEST FOR INJUNCTIVE RELIEF.

Because a preliminary injunction is an equitable remedy, "a court may properly consider any inequitable conduct by the plaintiff." *Hannon*, 241 F. Supp. 2d at 73. EEC's inequitable conduct precludes the relief it seeks against Mr. Emming in this case.

EEC has failed to enforce non-compete agreements with far more experienced technicians and even Regional Managers who left EEC's employment to work for competitors. In light of EEC's failure to even once attempt to enforce its non-compete agreements in the past, EEC's true motives in pursuing this case against Mr. Emming are clear. EEC's Complaint as well as Mr. Rapoport's Affidavit are replete with references to the Mutual Confidentiality Agreement between JT Packard and EEC. As set forth in

Mr. Drumm's Affidavit, while EEC and JT Packard entered into that agreement, no confidential information was exchanged because Mr. Rapoport was unwilling to do so. When Mr. Emming met with Mr. Rapoport after giving notice he was leaving EEC, Mr. Rapoport told Mr. Emming he would hate to see Mr. Emming get caught in the middle of a "company war" between EEC and JT Packard. It is apparent EEC is using Mr. Emming to fight its "company war" with JT Packard. EEC has come to this Court with unclean hands in its request for injunctive relief.

The absence of concern for Mr. Emming is further evidenced by the fact that despite his request for a copy of his personnel file on April 2, 2005, it took four requests and over five months before EEC provided Mr. Emming with a copy of that file. If EEC was so concerned about Mr. Emming's employment with JT Packard, then it should have acted promptly and consistent with Mass. Gen Laws ch. 149, § 52C, which gives employers five business days to respond to an employee's personnel file request.[1]

EEC's actions speak louder that its words. Its delay in seeking injunctive relief, its delay in providing Mr. Emming with a copy of his personnel file, its use of competitors' customer lists, and its failure to even attempt to enforce its non-compete agreement in this past preclude the four month injunctive relief it seeks.[2]

---

[1]    EEC also argues that Mr. Emming has confidential customer lists that he could disclose to JT Packard. That assertion is not accurate, and even if it was accurate the fact is that EEC uses its competitors' customer lists whenever it is able. EEC built its business based on competitors' customer lists. (Emming Aff. at ¶ 26.)

[2]    EEC's Motion for Preliminary Injunction seeks to enjoin Mr. Emming from working for JT Packard, competing with EEC or soliciting EEC's customers "for one (1) year from March 28, 2005 up until March 28, 2006." Despite the clear term of the relief sought, EEC cites one case in its supporting Brief for the proposition that it is "entitled" to a one year injunction commencing on the date the Court grants injunctive relief based on Mr. Emming's "willful" violation of his non-compete agreement. EEC is precluded from seeking relief past March 28, 2006, because it failed to request anything more in its Motion. Moreover, the case upon which EEC relies does not stand for the proposition that EEC is "entitled" to anything in this case. Unlike in this case, in *Modis, Inc. v. The Revolution Group, Ltd.* 1999 WL 1441918, *9 (Mass Super.), the employees, who were key employees for a recruiting company, almost immediately

## CONCLUSION

For the foregoing reasons, Mr. Emming respectfully requests the Court deny Plaintiff's Motion for Preliminary Injunction.

Dated this 1st day of December, 2005.

JAMES M. EMMING

By his attorneys,


/s/ Gary M. Feldman
Gary M. Feldman
DAVIS, MALM & D'AGOSTINE, P.C.
One Boston Place
Boston, MA  02108
(617) 367-2500



Counsel Pro Hac Vice

AXLEY BRYNELSON, LLP
Lori M. Lubinsky
Attorneys for Defendant
2 East Mifflin Street, Suite 200
Post Office Box 1767
Madison, WI  53701-1767
(608) 283-6752

---

began actively soliciting their former employers' customers, employees and consultants.  Further, the term of two of the three non-compete agreements at issue was three months, and the Court found that the employer did not sit on its rights but pursued injunctive relief soon after the violations were discovered.  The facts of this case are inapposite to those at issue in *Modis, Inc.*