UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ELECTRONIC ENVIRONMENTS CORPORATION,

      Plaintiff,

v.

JAMES M. EMMING,

      Defendant.

Case No. 05-11093 NG

**AFFIDAVIT OF JAMES M. EMMING**

STATE OF CONNECTICUT   )
                                      ) ss.
COUNTY OF NEW LONDON    )

JAMES M. EMMING, being first duly sworn, on oath deposes and states as follows:

1. I am adult resident of the State of Connecticut. I am the Defendant in the above captioned matter.

2. I have personal knowledge of the facts set forth herein.

3. I have read the Affidavit of Kenneth A. Rapoport.

4. Before I began work for Electronic Environments Corporation ("EEC"), I had over eight years experience as an Electronics Technician with the United States Navy. In that position, I not only became proficient with repair of electrical equipment but I developed curriculum and instructed students in the Navy's Electronic Technician School.

5. I became employed as a Battery Technician for EEC in June of 1999. In that position, I performed work only on batteries for customers of EEC. EEC's offer of employment dated May 11, 1999, is attached to Mr. Rapoport's Affidavit as Exhibit A.

6. In approximately November of 1999 after work exclusively as a Battery Technician for EEC, I received a promotion to UPS Technician, the title of which ultimately became Power Electronics Technician I. After that promotion, I was placed in the on-call rotation and received a company van and tools. Prior to that promotion, I did not have a company or company tools. In that position, my duties expanded to include service of uninterruptible systems ("UPS"), which was a material change in my job responsibilities. Prior to my promotion, I did not perform work on UPSs.

7. The principles involved in service of UPS equipment are substantially similar to the principles involved in my work as an Electronics Technician with the United States Navy.

8. At the time I received my promotion to the position of Power Electronics Technician I, I was not asked to sign nor did I, in fact, sign a new Non Competition and Confidentiality Agreement with EEC.

9. During my remaining employment with EEC, while my title changed at various times, my job responsibilities stayed virtually the same. My duties involved service of UPSs and related equipment for customers of EEC. At all times, I was paid by EEC on an hourly basis. While I received overtime pay for hours in excess of 40 per week, I was never guaranteed overtime or even 40 hours per week.

10. During my employment with EEC, I did not have the responsibility to review and monitor the performance of other employees.

11. EEC is a third-party provider of service for UPSs and related equipment. EEC is not a manufacturer of UPSs and related equipment; EEC services equipment manufactured by other companies. The vast majority if not all of the manufacturers of UPSs and related equipment also service their own equipment. Accordingly, EEC competes with various third-

party service providers, such as JT Packard & Associates, Inc. ("JT Packard"), as well as manufacturers such as MGE, APC, Powerware, and Liebert, for service of UPS equipment.

12. To my knowledge, I am the only former EEC employee who has left to work for a competitor of EEC who EEC has sought enforcement of its non-compete agreement.

13. Several service technicians far more senior to me as well as Regional Managers have left EEC to work for competitors of EEC, and were never sued by EEC. Examples of EEC's former employees who have left to work for competitors including the following:

   a. Bill Sheriden, who left to work for APC, a UPS manufacturer and servicer, and one time partner with EEC. Mr. Sheridan was far more senior to me, with approximately 15 years in the UPS industry.

   b. Mahubub Kalifa, who left to work for Liebert, a UPS manufacturer and servicer.

   c. Steve Laplant, who left to work for APC, a UPS manufacturer and servicer. Mr. Laplant was a senior field technician and long time employee of EEC. Mr. Laplant recruited Ed Resendes (see sub. d.) to leave EEC and work for APC.

   d. Ed Resendes, who left to work for APC after being recruited by Steve Laplant.

14. EEC has an extremely high turnover of personnel. In the five years I worked for EEC there were 15 different technicians (myself included) in my power electronics group, and only five (myself included) when I left.

15. Despite the high turnover of personnel within EEC, not one EEC customer within my group cancelled their contract with EEC because a technician left EEC.

16. Regional Managers at EEC have direct relationships with EEC's customers and are responsible for acquiring customers and renewing contracts with existing customers. Regional Managers have left EEC to work for competitors of EEC, and not once did EEC file suit attempted to enforce their non-compete agreement.

17. Throughout my employment with EEC, I was not responsible to recruit new customers for EEC or to solicit renewals of contracts from existing EEC customers. I was not involved in any way in negotiation of contracts for EEC.

18. Throughout my employment with EEC, I was not the sole or even primary contact from EEC with EEC's customers. While I had contact with the customers, 90% of the time my contact with the customer was with a facilities worker, not the person who made decisions for the customer regarding entering into or renewing a contract with EEC.

19. The only customer information I obtained from EEC was the customer name, address, site contact and, for some customers, my contact's phone number (again, 90% of the time this was a facilities worker, not the decision maker). The identity of EEC's customers is certainly not confidential; EEC's customers are listed on EEC's website, a copy of which is attached as Exhibit A.

20. Contrary to Mr. Rapoport's Affidavit, except on rare occasion, I did not have access to "decision makers' and influencers' names, their direct phone numbers and even mobile/cell numbers." EEC took great lengths to keep this kind of information from its technicians, including myself.

21. As a technician for EEC, my role was to show up, do the job and leave, which is no different that a technician who is sent to service a home appliance.

22. Contrary to Mr. Rapoport's Affidavit, I did not have access to or knowledge of

information about a customer's contract, including the length of the contract, start and end dates, and pricing. That information was kept secret from technicians, including myself. The "confidential" part of the customers' contracts including length, start and end date and price, were redacted by EEC at times when technicians including myself were allowed to see the contract. EEC took great lengths to keep this kind of information from its technicians, including myself.

23. Since EEC is not a manufacturer of UPS equipment, it utilizes the manufacturers' proprietary information to do its work. Contrary to Mr. Rapoport's Affidavit, EEC has no equipment manuals or training materials other than what it has acquired from technicians and through other sources that are created by the various UPS manufacturers, not EEC.

24. When I left my employment with EEC, I turned in absolutely everything that was given to me by EEC, including my contact information for customers whom I serviced and my laptop. The laptop included various forms that EEC uses in its business, and that was returned at the end of my employment.

25. The only thing I took with me when I left the employment of EEC is the knowledge that he gained from years of education, training and work experience.

26. Jim Peltier, an EEC Field Services Manager, told me on several occasions that he built EEC's business because he gave his prior employer's customer list to Mr. Rapoport after he left his position with Exide/Powerware, a competitor of EEC.

27. I left my employment with EEC because EEC did not comply with its agreement to review my rate of pay annually on my anniversary date. At one time, EEC adjusted the anniversary dates for employees three months in advance in order to save money. In addition, my performance reviews were constantly late. My September 2004 performance review was not

completed until December of 2004, and while my hourly wage was increased with that review, the rate increase was not back-dated to my anniversary date, even though this was done for other employees. In January of 2005, Mr. Rapoport promised to take care of this apparent error, but failed to do so any time prior to my termination of employment with EEC.

28. Contrary to Mr. Rapoport's Affidavit, my ending salary was not $71,942.00, but was $25.50 per hour which is equivalent $53,040.00 assuming 40 hour work weeks were available for me.

29. In speaking with Peter Drumm, General Manager for JT Packard, about possible employment with JT Packard, Mr. Drumm informed me that JT Packard had an immediate need to service existing customers UPS needs because it had lost an employee, and therefore needed someone to take over service of existing JT Packard customers.

30. Before I accepted JT Packard's offer of employment, I informed Mr. Drumm that for the first year after my employment with EEC ended I would only work for existing JT Packard customers, and that I would not solicit EEC's customers or employees or aid JT Packard in doing so.

31. I gave EEC two week notice that I was terminating my employment on March 28, 2005. Shortly thereafter, I was called into a meeting with Mr. Rapoport and others. Mr. Rapoport said that I had three choices: work for him, drive a Zamboni for a year, or hire an attorney. He also told me that I should be careful because I have a family to take care of and that it is expensive to hire a lawyer. He also said he would hate to see me get caught in the middle of a company war between EEC and JT Packard.

32. In that meeting, I told Mr. Rapoport that I was going to uphold my agreement with EEC because I was only going to service JT Packard existing customers over the next year,

and that I would not solicit EEC's customers. I told him I was an honest man and that I had all intentions of abiding by my agreement with EEC.

33. It has been over eight months since I left employment with EEC. Not once have I worked for a customer of JT Packard who was not already a customer of JT Packard when I began my employment with JT Packard.

34. In those eight months, I have not solicited work from EEC's customers for JT Packard or assisted JT Packard is doing so.

35. In those eight months, I have not providing any leads for any customers at all to JT Packard.

36. I requested a copy of my personnel file from EEC via company email dated April 2, 2005. My attorney again requested a copy of my personnel file by letters dated June 1, August 26 and September 9, 2005. I did not receive a copy of my personnel file until I received EEC's counsel's letter dated September 20, 2005. When I reviewed my personnel file, I noticed that two performance reviews were inexplicably missing.

37. I did perform work for EEC's customer, Cingular, on or about March 23, 2005. However, I had not even received an offer from JT Packard at the time I performed that work.

38. Contrary to Mr. Rapoport's Affidavit, my offer from JT Packard did not indicate I would receive a "3% incentive fee for all EEC service contracts" I am able to "acquire for Packard in competition with EEC." My offer includes a standard offer from JT Packard that I receive a 3% incentive fee for new customers for JT Packard, not EEC's customers. I have not

solicited customers for JT Packard and do not intend to do so during the term of my non-compete agreement with EEC.

39.  I know of no reason why EEC delayed until now, when I am eight months into my 12 month non-compete agreement, to attempt to enforce the non-compete agreement through filing a motion for preliminary injunction.

Dated this 12 day of Dec, 2005.

James M. Emming
CT OALic O2677 1324

Subscribed and sworn to before me
this O1 day of Dec, 2005.

_____
Notary Public, State of Connecticut
My commission expires: O5-31-06

-8-



# COMPANY INFO

- History / Mission
- National Coverage
- Management Team
- ▶ Clients
- Press Releases
- Press Release Archive
- Newsletter
- Directions
- Customer Satisfaction Survey
- Employment

## Clients

**Communications:**

AT&T Wireless
Cable & Wireless, Inc
Cingular Wireless
Comcast Cable Communications
Cox Communications
CTC Communications
EDS
M/A Com Inc.
NEXTEL
NEON Communications
NEES Communications
Nortel Networks
SBC Services
Sprint
T-Mobile
Verizon Wireless

**Educational:**

Harvard University
Houghton Mifflin
Mass Dept. of Education
Regis College
Teachers Retirement System, GA
Tufts University
University of Connecticut
University of Massachusetts
Wellesley College
Williams College

**Financial Services:**

Aetna Life Insurance
Allmerica
American Bankers Association
BancOne
Fidelity Information
GMAC Commercial Mortgage
One Beacon Insurance
Paymentech
SunGard Availability Services
Thomson & Thomson

**Hardware:**

Computer Sciences Corp.
EDS Corporation
ELCOM Services Group
IBM
NEC Computer Systems
New England Mechanical Services
Stratus Computer

**Healthcare Services:**

Atlantic City Medical Center
Blue Cross Blue Shield
Bristol-Myers Squibb
Cambridge Hospital
Cape Cod Hospital
Caritas Carney Hospital
Children's Hospital of Philadelphia
Deborah Heart & Lung Center
Fallon Healthcare System
Harvard Pilgrim Healthcare
Harvard Vanguard Medical Assoc.
Jeanes Hospital
Martin's Point Health Care
Mannatech
Newton Wellesley Hospital

**Internet:**

Ask Jeeves
Monster.com

**Property Management:**

CB Richard Ellis
The Gale Company
Johnson Controls
Lee Technologies
Prentiss Properties
Spaulding & Slye
Trammell Crow

**Public Service:**

Elderhostel- Nonprofit
Mass. State Lottery
National Grid

**Retail:**

Converse
Cumberland Farms
Gillette Company
Gorton's Seafood
Perdue Farms
Reebok International
Sears Roebuck & Co.
Talbots

**Software:**

Clean Harbors
iBasis
Kronos, Inc.
Lightbridge

**Technology:**

ABB Technologies
Analog Devices
BE Aerospace
Boston Scientific



EXHIBIT A

Copyright 2005 Electronic Environments Corporation. All rights reserved.